And this is 2017-25-44. We have one case to hear oral arguments on this afternoon, and that's PurePredictive, Inc. v. H2O.AI, Inc. And this is 2017-25-44. We have one case to hear oral arguments on this afternoon, and that's PurePredictive, Inc. your predictive ensembles are not mathematical formulations, I'm quoting from Blueberry. Why aren't they? Well, so the, and that's a great question. So a mathematical formula is essentially, like, we say a function where you have A plus BX equals Y or something like that, right? So that would be just sort of a pure mathematical formula. And so we're not claiming that you could just simply claim math, okay? But when you use math, or you use an application, like- You use an algorithm to generate another algorithm, which is what you're doing. Yeah, but let's say for example, so the application math in and of itself is not necessarily unpatentable, right?  It's just learned functions. But I think part of the confusion comes here is in the definition of a learned function and what it means in the context of the specification. So if we were to go to, for example, and this was actually one of the things that in our opposition brief that we presented to the district court, the definition of a learned function. And that would be, okay, let me pull that. So a learned function, and this is, I want to give you the right citation. I think it's on page seven of the opposition brief, but as- What's the number in the record? And that would be joint appendix 157, lines 12 through 15. It's also in the patent, joint appendix 27, column 8, 50 to 53. When you're ready, I can proceed. Is that- Yeah. Do you think that that's definitional? Yeah, so it is in the sense that, so a learned function, it's computable, readable code. And then if you look at it in the context of the claim, what's going on here is that you're generating these learned functions. And these learned functions have a component of metadata to them, okay? Because you're arranging them in a way that you can direct data to the different learned functions. So you generate- If you generated a regression equation, would that be a learned function? Well- From data, you know, you do the usual- Right, so as it's used here in the claim- Right, that's a great question. So as it's used here in the claims, the regression, like let's say a Bayesian classifier or something like that, or like you're saying, a regression formula. That by itself doesn't work within the context of the claims, okay? So if you look at figure 5 of the patent, which is on page 8 of the opening brief, there's one page you can look at it. It's- And that's- And what you'll see, this is a predictive ensemble and the learned functions. So if you look here, you can see these various types of algorithms. And, of course, an algorithm- Where are you, sir? I apologize. Page 8 of the opening- the blue brief, page 8. What's figure 5? This is figure 5 of the patent. Sorry, what's that? This is figure 5 of the patent. Is that what we're looking at? That's correct, yes. Now, if you look at each of these, alongside each one it'll say features A through F, or feature N through S, okay? And then down below you're going to see where it explains that the different learned functions include different types of decision trees or things like this, but they're configured to receive a subset of data. So the learned functions are identified using metadata. So you'll have, like, this computer-readable code that takes the metadata, and the metadata dictates which set- which type of data it's going to get. It may be a column of data. It could be some sort of a group of data, different- or a class of data. That's going to be dictated by metadata that is directed to a particular- and that gets- and so the code, we've got this computer-readable code that ties this metadata to an algorithm. Claim 14 is your representative claim, yes? Well, that's what the defendants argued down below- or down at the district court level, and it's- Is it or isn't it? Well, I'd say not necessarily. I think claim 1 is more representative, but, I mean, the problem with just saying that it's representative is they made arguments that this is representative, and then they started to claim that it was missing all the stuff that was actually found in the other claims that were sort of computer-related. I mean, if you look at claim 14- To me, it appears to represent the running of data through an algorithm to create a new one. Well, except for that- and that's a good point. So except for the data is not- so the generation of the- well, not of algorithms, because learned function, as I mentioned, we don't look at that as an algorithm, just solely an algorithm, right? But if you are generating- Why isn't it an algorithm? Well, because it also- you're also including these metadata ties, right? So it's operated by an algorithm, right? And it may have various levels of algorithms that are tied to it, okay? But then if you were to- when you're generating these learned functions- So you're creating an algorithm and adding other data. Metadata, yeah. But metadata is referential data, right? You're referencing data using data in order to know which predictive information you want to process, okay? Now, the other thing that- Just give one concrete example of that. Sorry. Metadata referencing other data, the latter to be- Yeah, so- Just give one concrete example. Abstraction is the problem in this case. Okay, so let's say there's a bunch of information. You have information regarding zip codes, information regarding marital status, and information regarding something like death rates, okay? And so different types of predictive modeling or artificial intelligence is going to be more adept for different types of- it's going to be more adept for different types of information, for getting you results, okay? So in this- What we're claiming here is you pseudorandomly generate these learned functions. And so the great part about pseudorandomly doing it without prior knowledge is you start to remove a bias, assumptions about the different types of artificial intelligence modeling, okay? So it's artificial intelligence modeling. There's a lot of- Some of these like Bayesian- So what? marital status and death rate data- Okay, so- To begin to develop some kind of guess about correlations. No, so there's a little bit different here. This is where I think there's a little bit of confusion at the district court. So the data that you're using, the generation pseudorandom in that you're really just producing a bunch of these various types, and then you are running it against test data. But in the prior art, you had- There are these known artificial intelligence models that they use on computers to generate predictive outcomes. But those carried assumptions. There was sort of these kind- There was an assumption that this could do this kind of a result. And so that's where your experts would get in and get involved with having prior knowledge and say, why don't we try some of these? Why don't we try some of these? By removing that expert, you remove the assumptions, and you get a better result from what you're producing. So you're producing all these different- The generation of them isn't necessarily by filtering data through- You don't have something that says, let's get these kinds of algorithms. Let's get these algorithms because they have assumptions based on them because of the data. But once you generate a bunch of them, you can analyze it based on the test data. And then you don't necessarily get the fastest result out of these or the best result by each individual one. What happens is you start to combine them, and you put them into an ensemble. And together, you may end up getting a bunch of slow learned functions. But when you combine them together, you get a better result, a better predictive result. How do you deal with the citation to written Cognacore v. Nintendo, which is a 2017 case? Sorry. It's in the red brief, and yet you didn't mention it in your reply brief. Let me get my glasses. I apologize. Okay. It holds that a process that starts with data, adds an algorithm, and ends with a new form of data is directed to an abstract idea. Well, because the claims aren't getting us to a new form of data. What we're doing is we're creating an arrangement of learned functions. Now, that learned functions will come up with data, but that's something else, right? The claim is actually towards the arrangement of these and how we arrange them. I asked you about Claim 14. You said, well, it's not just an algorithm. There's metadata. That's data, yes? Yes, but that data itself is an arrangement, right? Let's go to EnFish, for example, right? So in EnFish, you had a single column data table that was self-referential, right? So, I mean, this is obviously, we all know this case. It's like one of the most famous, one of the more famous cases out there for us right now, right? And there was a relationship defined by data, right, within a data table there that made it patent eligible. In this case, there's a relationship. Where do you show that? Well, both in the specification and in the claims. Let me pull this out. So the, so we talk about in the last element, are you wanting me to go to Claim 14 then? You said Claim 1. Yeah, on those ones, they're very similar. They're slightly, let me see if those ones are, I know there's a little bit of difference between a couple of the claims in the last element. Like Claim 17 is slightly different. But we can go to Claim 14 or Claim 1. I think those ones are fairly. Representative? Well, we're avoiding that word, but I think there are some distinctions between them a little bit. But for the purposes of this, let's go to Claim, let's do go to Claim 1. But basically, at the last part of Claim 1, you see that multiple learned functions are selected and combined based on evaluation metadata. So that combination, that arrangement, is going to be based on this metadata. Where are you? Line what? Sorry. One, two, three lines into the paragraph. Actually, I probably should open the actual, I'll open the actual patent so we can be reading patent lines. It'll make it easier. So if we are. This is going to be, I have an unjoined appendix 35. And it's going to be. Column 23. And I'm coming down to. OK, so line 11, I guess it would be the multiple learned functions selected and combined. How does it do that? How does it how does it do that? Yeah. So it does that by after it combines and recombines them and and finds. Where does it say that? That'd be in the specification. But the claim itself is referencing a, well, it also actually says here based on the evaluation metadata. So. Mr. Clegg, you're well into your rebuttal time. Do you want to stop now? I'll restore three minutes of rebuttal time. Did you have any questions or would you like me to. Well, you can continue on and use up all your rebuttal time if you want. Or you can stop here. Let's stop here. So we have some time for rebuttal. Let's do that. I'd appreciate that. Thank you. Counselor Bostic, Bostic. Thank you, Your Honor. May it please the court. I'd like to start by clarifying some of the terminology that's at issue. I think the introductory argument. This may take most of your argument. It quite well could. But I think there's a few terms that are particularly important and that were discussed so far. And I want to start with a learned function because I think I heard a misdescription of that. That is defined in the patent. This is at Appendix 27. It's at Column 8. And it's at the bottom. It starts at line 50, if that's helpful. This is the pair of sentences Mr. Clegg pointed to. So it's above that. This is a learned function. Oh, I'm sorry. It is those sentences, but I want to focus on a different aspect of it. Mr. Clegg focused on the fact that it says it's computer-readable code. But what's important here is that a learned function is something that accepts an input and provides a result. That is all that the learned function is. It can be anything. It can be, for example, Judge Toronto, as you suggested, a regression. That's clear from Figure 5. It indicates a regression as one of the learned functions. But it's well broader than that. It is anything that accepts data as an input and provides any kind of result. And the pattern here at Column 8 goes on to explain that the result can be a classification, a confidence metric, an inferred function, a regression function, an answer, a prediction, a recognized pattern, a rule, a recommendation, or the like. It's extremely broad. But I also want to clarify that the metadata is not part of the learned function. If we look at the claims, and I think we may now have agreement on the fact that Claim 14 is representative, but it's actually not meaningfully different from Claim 1. I think you have agreement on that. Yes. So if we look at Claim 1, and this is at Appendix 35 at the top of Column 23, it talks about the predictive ensemble. And the predictive ensemble is made up of two things. One is the subset of learned functions that you have selected in some unspecified way based on some unspecified form of evaluation, and then the rule set about how you're going to apply those. And the rule set is synthesized from the metadata, and the functions are selected based on the metadata, but they don't contain the metadata itself. So what you have here is exactly what the district court found and correctly determined to be the patent-ineligible abstract concept of testing and refining mathematical algorithms. That's a quote from Appendix 11 in the district court's opinion. It's nothing more than manipulating and organizing data and math. To be clear, we are not claiming that these claims are directed to a mathematical formula, to any particular mathematical formula or any set thereof. The claims are directed to simply this idea that certain functions will be better at predicting something about certain types of data, certain subsets of data, certain features within the data. And so you pseudorandomly generate a plurality of functions, which again can be anything, and then you evaluate them in some way to determine something about those functions, and particularly which data they will pair with. And then you have this predictive ensemble. And the predictive ensemble is important. The predictive ensemble is defined by the claim language itself, this claim language that I just referenced. It is nothing more than the subset of functions you're going to use and the rule set, the information that tells you how you're going to use them. There is no structure. This is not ENFISH. In ENFISH, the claims, as construed under Section 112F, required a particular structure to the database. They required, as opposed to the prior art, which had multiple tables in the database and then definitions of the relationships between them, the claims in ENFISH were directed to a self-referential database. And so here you only used one table, and you had the rows that were used to define what the columns mean. That's a structure. So let's go back. What would you say the predictive ensemble is? The predictive ensemble, again, it's defined in the claims, Your Honor. The predictive ensemble, it comprises the subset of... Where are you? I apologize. I'm at Appendix 35 at Column 23, and this is in Claim 1. And this is the final limitation, which talks about the predictive... Which line? Are you around Line 7 or so? I am at Line 7, yes. This is the predictive compiler module, and the predictive compiler module is what forms the predictive ensemble, and then the claim goes on. The predictive ensemble comprising a subset of multiple learned functions from the plurality of learned functions. The multiple learned functions selected and combined based on the evaluation metadata for the plurality of learned functions. And the predictive ensemble comprising a rule set synthesized from the evaluation metadata to direct data through the multiple learned functions. So, again, this shows how the predictive ensemble really is the abstract idea itself. It is this notion that you will have some functions. They may be combined in different ways or extended in different ways, but some set of functions and then information that comes from this metadata, which can be anything. It just means data about data. I didn't read the predictive ensemble as being any type of structure. I couldn't find that it's a separate structure. Is that correct? That's correct. Nothing in this patent describes it in any structural way. It seems to be a way of thinking. Absolutely. And that's certainly claim 14. But in our opinion, most of the claims can be performed entirely in the human mind or with pen and paper, or at the very least the equivalent of human mental activity, which this court has said is not patent eligible. So, yes, there's there's no there's no structure to the predictive ensemble. And I want to talk about a term that is used repeatedly in pure predictives brief, and that is metadata structured environment, which does not appear in the patent, but is their characterization of what the predictive ensemble is. And if you unpack that term, I think it helps explain why this sounds like it might be like MFISH, but really is not at all. A metadata structured environment is, as you suggest, Judge Raina, not any specific structure. All it's telling you is that you have information that is organized by using metadata. It doesn't tell you how it's organized. It doesn't tell you what kind of metadata. It doesn't tell you how you how you actually make that happen. And again, metadata is a broad term that simply means information about information. I want to also talk about the predictive voting system. I think there was also a little bit of confusion on this. This pre-predictive argues to this court, they did not argue below, that the that the claims are patent eligible at Alice Step 2 because they differ from the prior art Richter reference, which described using a predictive voting system. I first want to clarify the predictive voting system is not what is described in the 446 patent as the prior art. If you look at Appendix, I believe it's 27. Appendix 27, and this is column 7 and it's it's lines 2 through 16. This is the description of the prior art that used a data scientist, and it describes the data scientist, the human who would, and I'm at line 8. Data scientists typically must determine the optimal class of learning machines that would be the most applicable for a given data set and rigorously test the selected hypothesis by first fine tuning the learning machine parameters. And second, by evaluating results fed by trained data. That's not describing a predictive voting system. That is describing a human implemented version of exactly what these patent claims cover. And underscores the fact that these claims are simply automating human activity, which again, this court has repeatedly held is not does not make something patent eligible. The predictive voting is a different concept. It instead of running different subsets of data through different functions, you run all the data through all of the functions and then you each result gets a vote. And so, for example, if if if you have 10 functions and six out of 10 say the answer is X and four out of 10 say the answer is Y, then your answer is is X. The fact that the prior art or at least one prior reference use that form of predictive analytics and this patent describes a different form of predictive analytics. That's not an inventive concept. Those are both abstract ideas. They may the reference may have claimed predictive voting in a patent eligible way. We don't have those claims before us but but the mere fact that this might be a novel way of doing predictive analytics, which we don't concede but even if it is novelty alone does not get you section one on one eligibility. I also want to just make sure to clarify there's a reference to artificial intelligence. This is not a patent about artificial intelligence. This is not a patent about machine learning. This is a patent that is at most about predictive analytics that term. It, in fact, appears only in the preamble to the claims but we can agree that it's about predictive analytics and the patent here again tells you what predictive analytics is. This is an appendix 26 column six line 25 predictive analytics is the study of past performance or patterns found in historical and transactional data to identify behavior and trends in future events. It's simply taking past behavior and using that to predict the future. The patent goes on to say this may be accomplished using a variety of statistical techniques, including modeling machine learning data mining or the like. And then the following paragraphs discuss among other things that a category of learned functions may be classifications, which are a form of artificial intelligence. And so, this patent may rely on machine learning or artificial intelligence to perform predictive analytics that is not required by any of the claims there's no allegation that it's required by any of the claims, but this is not a patent directed to artificial intelligence. This report has further questions we asked the district court be affirmed. Thank you. We'll put you back to three minutes. Thank you, Your Honor. I'd just like to address quickly, if it pleases the court, a couple of issues that were raised. And then a couple that I didn't get a chance to address. One of the issues would be H2O alleges that this is just automating human activity. And so, I want to reference back to the specification and this is Appendix 26 and Appendix 27. Columns and line. Right. So, on Column 6, there's a bunch of different... Lines. Yeah. I'll start with line 65 or 66. But up above 66, it just references a whole bunch of different types of modeling, predictive analytics modeling. And then right there, it says, each of these forms of modeling make assumptions about the data set model. The given data, however, some models are more accurate than others and none of the models are ideal. And that's going on to Column 7. And then coming down on Column 7, at about line 8, it says, a data scientist typically must determine the optimal class of learning machines that would be most applicable for a given data set. So, again, we're talking about there's these assumptions that come with a data scientist. And it kind of gets in the way of... You get a more effective predictive ensemble, this predictive analytics tool, because you're removing the bias. You're removing... And there's no prior knowledge and you're doing pseudorandom generation. There's no pseudorandom generation and there's no omitting the knowledge of an expert when you're doing it. So, you're not really doing the same thing in the same way that an expert would do. Would you say it's doing it faster? It's pretty much doing the same thing, but faster. No, it's not. It's doing... It does it faster, but the point is not that it's doing it faster. The point is that it's doing it differently. The point is you're removing the bias, the domain bias. You're removing the expert's presumptions about a group of models because you're pseudorandomly just generating different ones. So, you're removing the data scientist. You're removing the data scientist. And that removes these biases. How do you randomize it? The pseudorandom generation? Well, there's, you know, the question is you have a software program that generates, you know, and pseudorandomly... Data scientist uses a software program to generate random data. Well, the fact... Well, prior to the date of the application, you wouldn't have necessarily seen that as a routine and conventional issue, and I think that's what we're getting at is that... Well, my question was can a data scientist do that? Could they... Well, using... Yeah, certainly anybody could do it using the invention, sure, because... No, no. Could a data scientist use a program to generate random data in order to randomize it? Well, we're talking about random generation of data versus learned functions, right? So, what we're doing is they could certainly randomly generate data. This is randomly generating learned functions, but that doesn't make it routine and conventional, particularly here where we're doing it in order to create ensembles. And that is one of the things that I want to address because... I apologize. We're... You're out. I'm out of time. May I finish this thing? Why don't you go ahead and conclude? Okay. I believe we have your arguments. Okay. The main thing I wanted to make... The point there I wanted to make was that there were several issues in this point that go to routine and conventional, that they're not routine and conventional. And outside of that, you're looking at a 103 issue anyway. And then, I guess my time's up. I had one more point. It's about 30 seconds, if I may. They pointed out that ENFISH had a particular structure, the self-referential database. But one of the things that were pointed out in ENFISH is, and this is addressed on Joint Appendix 161, where we cite this in our opposition brief. Specifically, the ENFISH court found that the specification teaches the self-referential table functions differently than conventional database structures. And that while the structural requirements of current databases require a programmer to pre-define a structure and subsequent data entry must conform to that structure, the database of the present invention does not require a programmer to pre-configure a structure to which a user must adapt data entry. And so I think that is very applicable here, and we'd request that the court reverse it. Thank you very much. This court is now in recess.